UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
VIVIAN HUBBARD and PAMELA RUIZ-MOK,    :

         Plaintiffs,    :

    - against -    :    05 Civ. 4396 (PAC)
                              OPINION AND ORDER

                                      :

THE PORT AUTHORITY OF NEW YORK AND
NEW JERSEY, ANDREW SAPORITO, BARRY    :
KRAVITS, JOHN TEN BERGE, FRED LESTO,
and STEPHANIE DESIRE-LEWIS,    :

         Defendants.    :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

        HONORABLE PAUL A. CROTTY, United States District Judge:

        Vivian Hubbard, an African-American female, and Pamela Ruiz-Mok, an African-American/Caribbean/Puerto Rican female, (collectively "Plaintiffs") allege that their employer, The Port Authority of New York and New Jersey ("Port Authority"), and five of its employees (the "Individual Defendants") (collectively the "Defendants"), created a hostile work environment and discriminated against them in their employment on the basis of race in violation of 42 U.S.C. § 1981.[1]  Defendants move for summary judgment on all claims and also as to the Individual Defendants.  For the reasons that follow, the motion is DENIED with respect to the claim of hostile work environment, though claims against certain Individual Defendants are dismissed, and GRANTED with respect to the claim of discrimination.

---

[1] Plaintiffs' complaint also states a claim for retaliation (see Compl. ¶ 43), though neither party addresses this claim outside the context of the disparate treatment and hostile work environment claims.  Defendants characterize Plaintiffs' complaint as asserting two claims, and Plaintiffs do not contend otherwise in their opposition papers.  Without guidance or argument from the parties, the Court treats Plaintiffs' allegations of retaliation not as a separate claim but within the framework of Plaintiffs' other discrimination claims.

# BACKGROUND

## I. The Parties

Hubbard and Ruiz-Mok were general maintainers assigned to the mechanical shop at the New Jersey Marine Terminals ("NJMT") at Port Newark, a facility managed and operated by the Port Authority. (Defendants' Rule 56.1 Statement ("DSOF") ¶ 10, 11.) The Port Authority is a government agency, formed by an interstate compact entered into by New York and New Jersey in 1921, whose mission is the development of public transportation, terminal, and other facilities of commerce within the statutorily defined Port Authority district.[2] (Compl. ¶ 5.) The Individual Defendants are: Andrew Saporito, the manager of NJMT (Compl. ¶ 8); Barry Kravitz, the chief maintenance supervisor of Port Newark (Compl. ¶ 9); John Ten Berge, the general maintenance supervisor at Port Newark (Compl. ¶ 10); Fred Lesto, the supervisor of the mechanical shop at Port Newark (Compl. ¶ 11); and Stephanie Desire-Lewis, the manager of the office of equal opportunity at the Port Authority (Compl. ¶ 12).

## II. The General Maintainer Position

### A. The Job Description

The General Maintainer position involves hard, dirty, and unpleasant tasks. Port Authority Specification No. 2002 describes the general maintainer position as follows:

> [T]his class performs a variety of manual and semi-skilled work in accordance with established practices, work orders, or instructions. Work generally requires the use of general maintenance skills and knowledge of a variety of trade fields such as carpentry, landscaping, painting, roofing, structural, and mechanical maintenance, including a working knowledge of the use of materials, tools, and equipment of these trades. This class operates a variety of automotive equipment including standard heavy-duty, special purpose, and auxiliary equipment.
> . . .
> 3. Physical and Mental Demands—Frequently required to stand for prolonged periods of time. Frequently performs heavy lifting (up to a maximum of 90 lbs.). Frequently carries objects (usually no more than 20 ft.). Frequently has to bend,

---

[2] See Baron v. Port Auth. of N.Y. & N.J., 271 F.3d 81, 83 (2d Cir. 2001).

kneel, stretch, squat and crawl.  Occasionally required to work at heights (up to a maximum of 40 ft. above ground).
. . .
4.  <u>Working Conditions</u>—Frequent exposure to dirt, dust, fumes, extreme heat or cold, confined or dark areas.  Work outdoors in various types of weather.  Occasionally works from fixed scaffolds, roofs, ladders, tower and bucket trucks, boats, etc.

(Affidavit of John Ten Berge ("Ten Berge Aff."), Ex. A, p. 1, 3.)  The job specification provides that general maintainers "[m]ay work alone or as part of a crew." (Ten Berge Aff., Ex. A, p. 1.)

## B.  The Mechanical Shop at NJMT

The mechanical shop at NJMT performs plumbing functions and employs approximately six mechanics from the skilled trades, such as plumbers or steam and sprinkler fitters, and four general maintainers. (DSOF ¶ 12.)  As general maintainers in the mechanical shop, Plaintiffs' duties included:  blowing down the low points (draining pipes in warehouse sprinkler systems to prevent freezing and cracking); servicing water carts (meters that regulate flow from Port Authority water pits to berthed ships); maintaining the water pits; snow removal; inventory; painting; and cleaning. (DSOF ¶¶ 13-15; Plaintiffs' Rule 56.1 Statement ("PSOF") ¶ 15.)  General maintainers may work individually or with a supervising mechanic, depending on the assignment. (DSOF ¶ 15.)

## C.  Union Contract

Port Authority general maintainers and mechanics are members of the International Union of Operating Engineers ("IUOE") AFL-CIO Local 15, Local 30 and Local 68 (formerly the Building and Trades Union), and their employment rights are governed by the IUOE's written contract with the Port Authority. (DSOF ¶ 9; Ten Berge Aff., Ex. D.)  Provision XXII of the IUOE contract preserves past employment practices. (DSOF ¶ 18; Ten Berge Aff., Ex. D, p. 14.)

### III. Plaintiffs' Employment

#### A. Plaintiffs Become General Maintainers

Plaintiffs initially worked for Port Authority as toll collectors. (DSOF ¶¶ 1, 2.) At her deposition, Hubbard testified that she became aware of an opportunity to apply for a position as a general maintainer from a sign posted inside the tollhouse. (Hubbard Dep. 17-18.[3]) That notification (see Ten Berge Aff., Ex. B) incorporated by reference the job description quoted in Part A.2.a. Hubbard testified that she understood the duties of a general maintainer at the time she applied for the position. (Hubbard Dep. 18.) In 2001, Hubbard and Ruiz-Mok enrolled in a training course that provided instruction on general maintainer job duties. (DSOF ¶ 4.) Hubbard began her employment as a general maintainer at the Holland Tunnel on April 1, 2002, transferred voluntarily to the track and paving shop at NJMT on January 19, 2003, and moved to the mechanical shop on May 12, 2003. (DSOF ¶ 11.) Ruiz-Mok was hired on March 31, 2002 as a general maintainer at the Newark Airport housekeeping shop, voluntarily transferred to the track and paving shop at NJMT, and switched to the mechanical shop on April 23, 2003. (DSOF ¶ 14.)

#### B. Other General Maintainers

When Plaintiffs first arrived in the mechanical shop, the other two general maintainers were Gail Scala, a white female, and Michael McVey, a white male. (PSOF ¶¶ 17, 18.) Scala was replaced by Barbara Smith, a white female, on September 28, 2004. (DSOF ¶ 16.) Smith was also a shop steward, which, under the union contract, entitled her to "first choice on vacations and work schedules or tours as vacancies occur." (PSOF ¶ 20; see Ten Berge Aff., Ex. D, p. 7.)

---

[3] The November 16, 2005 deposition of Vivian Hubbard is attached as Exhibit A to the Affirmation of Kathleen Gill Miller, dated April 5, 2007.

## IV. Alleged Discriminatory Conduct

In their Complaint, Plaintiffs allege two broad forms of discrimination: (1) that which related to their work assignments, responsibilities, and employment privileges as general maintainers, as evidenced by the disparity in treatment they received relative to their peers (the discrimination claim); and (2) that which speaks more generally to the conditions of their employment at Port Newark and, more specifically, in the mechanical shop (the hostile work environment claim). Plaintiffs also allege that, when they filed complaints about discrimination, their supervisors failed to take sufficient steps to prevent additional incidents, exposing Plaintiffs to retaliation.

### A. Discrimination Specifically Related to the General Maintainer Position

Plaintiffs claim that their supervisors in the mechanical shop, principally Fred Lesto, passed them over for assignments with shop mechanics (Affidavit of Vivian Hubbard ("Hubbard Aff.")[4] ¶ 77, 78, 91), but "always assigned" McVey and Smith for such jobs (Compl. ¶¶ 21, 29). Plaintiffs allege this disadvantaged them, because "general maintainers can get to learn more and advance on the job when they are assigned to work with the mechanics." [5] (Compl. ¶ 18.) Plaintiffs had to perform onerous and/or unwanted tasks, such as cleaning the shop (Hubbard Aff. ¶ 49), taking inventory (Affidavit of Pamela Ruiz-Mok ("Ruiz-Mok Aff.")[6] ¶ 21), and unclogging toilets. (Ruiz-Mok Aff. ¶ 33.)

Plaintiffs also allege that they were made to perform tasks for which they were inadequately trained (Hubbard Aff. ¶ 10; Ruiz-Mok ¶ 16), short-staffed (Hubbard Aff. ¶ 8), or under-equipped (Hubbard Aff. ¶¶ 8, 9). Plaintiffs claim they were repeatedly rebuffed when they asked to work with

---

[4] Attached as Exhibit A to Plaintiffs' Memorandum of Law in Opposition to Motion to Dismiss.
[5] Ruiz-Mok claims that Gail Scala became a mechanic after gaining experience while working with mechanics as a general maintainer. (Ruiz-Mok Aff. ¶ 35.)
[6] Attached as Exhibit B to Plaintiffs' Memorandum of Law in Opposition to Motion to Dismiss.

each other or with another employee, even when they explained that they felt uncomfortable working alone in isolated warehouses (Hubbard Aff. ¶¶ 23, 47, 48; Ruiz-Mok ¶¶ 23, 27, 65), or admitted that they could not perform the tasks assigned (Ruiz-Mok Aff. ¶¶ 29-32, 48).[7] When they were assigned together, Plaintiffs were separated without justification. (Ruiz-Mok Aff. ¶ 55.)

Plaintiffs also assert that they were subject to a double standard in the mechanical shop that touched all aspects of their employment. For instance, Plaintiffs allege that they were not permitted to take overtime in the same manner as the other general maintainers. (Hubbard Aff. ¶ 40, 44, 87.) They contend that they were only offered overtime on weekends and usually without the opportunity to work with a mechanic, even though other general maintainers were given overtime during the week. (See PSOF ¶ 25; Hubbard Aff. ¶ 74; Ruiz-Mok Aff. ¶ 71.) Plaintiffs contend that, unlike McVey and Smith, they were not permitted to work through lunch and most requests to depart for the day early at 2:45 p.m. rather than the customary 3:30 p.m. were refused. (See PSOF ¶ 23; Hubbard Aff. ¶¶ 7, 20, 41, 45, 46, 61, 64, 72, 75, 79, 82; Ruiz-Mok Aff. ¶¶ 20, 22, 25, 40, 50, 52.) Lesto also allegedly told Plaintiffs that they could not eat breakfast after 7:15 a.m., although their white co-workers were given additional time. (Hubbard Aff. ¶¶ 21, 41, 42; Ruiz-Mok Aff. ¶ 19, 49, 57-59.) Specifically, Hubbard contends that in December 2003 Lesto assigned her difficult work "while other employees were permitted to come back to the building early to have a Christmas luncheon." (Hubbard Aff. ¶ 12.)

Plaintiffs also complain that Lesto would give out work assignments to all of the general maintainers in the shop but that only Plaintiffs were forced to actually perform the work. (Hubbard Aff. ¶ 34, 76; Ruiz-Mok Aff. ¶ 34, 69.) For instance, Plaintiffs allege that while McVey was

---

[7] In her deposition, Ruiz-Mok admitted that she had difficulty blowing out the low points 80% of the time. (PSOF ¶ 37.) Plaintiffs claim that this job typically requires two people, and Ruiz-Mok encountered problems because Lesto refused to assign adequate assistance. (PSOF ¶ 37.) Lesto, in fact, ordered Ruiz-Mok to train Smith on low points, demonstrating her expertise under normal conditions. (PSOF ¶ 37.)

assigned to service low points on paper, he did not actually do this work. (PSOF ¶ 21.)  Instead, McVey was spotted talking on his cell phone (Ruiz-Mok Aff. ¶ 69) or working out at the small gym above the mechanical shop (Hubbard Aff. ¶ 7; Ruiz-Mok Aff. ¶ 17), at times when he should have been working.

Lesto documented Plaintiffs' performance problems from 2003 to 2005, when he ceased to be their immediate supervisor (DSOF ¶¶ 26-27), but did not share these reviews with Plaintiffs nor comment negatively about their work performance (PSOF ¶¶ 26-27).  Plaintiffs complain that Lesto unreasonably accused them of not wanting to work when, in fact, they were attempting to perform tasks but could not for some reason. (See Hubbard Aff. ¶ 9, 16.)  Hubbard also contends that Lesto followed Plaintiffs while they worked and became hostile when, for legitimate reasons, they did not perform to his standards. (Hubbard Aff. ¶ 17.)  Ruiz-Mok claims that she was forced to use a rescue saw to cut a length of pipe under pressure from her superiors, who stood staring at her, waiting for her to make a mistake. (Ruiz-Mok ¶ 70.)

Ultimately, Plaintiffs were told that they were not part of the shop but rather just "tagged to the shop," though Plaintiffs do not explain the status distinction. (Hubbard Aff. ¶¶ 93-95.) According to Hubbard, in August 2005, they were put under the supervision of a mechanic, Jerry Tobias, and were the only general maintainers being supervised by someone other than the formal supervisor, Lesto. (Hubbard Aff. ¶ 59.)  Tobias is not named as a defendant in the present suit.

**B. General Discrimination in the Mechanical Shop**

Plaintiffs also describe a work environment where the actions of their supervisors, the mechanics, and another general maintainer, McVey, made it clear that they were not wanted in the shop.[8]  The clearest manifestation comes from the mechanics, who, when ordered to work with

---

[8] Indeed, Plaintiffs received repeated warnings from concerned fellow employees to be careful because Lesto and the mechanics did not want them in the shop. (Hubbard Aff. ¶ 14; Ruiz-Mok Aff. ¶¶ 13-15.)

Plaintiffs, often refused, even threatening to leave the shop rather than cooperate. (Hubbard Aff. ¶ 53, 57, 69, 92; Ruiz-Mok Aff. ¶ 5.)  Plaintiffs contend that management condoned this behavior and acquiesced by assigning Plaintiffs to perform other, often desultory, tasks on their own. (Hubbard Aff. ¶¶ 53, 54, 69.)

Plaintiffs claim they were written up for failing to properly perform certain jobs when they had not worked on those jobs. (Hubbard Aff. ¶ 56.)  They allege that, when they were assigned to work on water carts, they often found that other shop employees had sabotaged their workstation by, for instance, tightening a vice so that Plaintiffs could not loosen it. (Hubbard Aff. ¶ 60, 76, 88; Ruiz-Mok Aff. ¶ 73.)  Plaintiffs also claim that, when they radioed the shop from remote work locations, Lesto lied and said that he could not hear them. (Hubbard Aff. ¶ 43; Ruiz-Mok Aff. ¶ 47.)  Plaintiffs allege that shop employees humiliated them when they could not operate malfunctioning machinery. (Hubbard Aff. ¶ 81.)  Plaintiffs also claim that Lesto ordered them to do work in areas that simply did not exist.[9]

Plaintiffs allege a continuous pattern of abusive and hostile behavior by shop employees that was condoned by supervisors.  They complain that they were cursed at (Hubbard Aff. ¶ 55.), pushed (Hubbard Aff. ¶ 32), barricaded inside the shop (Hubbard Aff. ¶ 28; Ruiz-Mok Aff. ¶ 41.), spied upon (id. ¶ 33.), reprimanded for using the restroom (Ruiz-Mok Aff. ¶ 52), and verbally abused (Hubbard Aff. ¶¶ 50, 58; Ruiz-Mok Aff. ¶¶ 4, 5, 18).  Shop mechanics allegedly commented that the shop smelled bad when the Plaintiffs entered the shop. (Hubbard Aff. ¶ 71, 90; Ruiz-Mok ¶ 11, 77.)  Plaintiffs claim that McVey twice stated in their presence that "working in sewage and waste is Pam's and Vivian's job" without receiving a reprimand from Lesto. (Hubbard Aff. ¶ 15; Ruiz-Mok Aff. ¶ 6.)  Hubbard claims that, just after she returned from a work-sponsored harassment class,

---

[9] Hubbard alleges that she "was . . . assigned to do berths 88 through 98 when [Lesto] knew those berths did not exist." (Hubbard Aff. ¶¶ 12, 31.)

Lesto joked about harassment. (Hubbard Aff. ¶ 18.) Plaintiffs also allege that a mechanic, Frank Bailey, made disparaging remarks about African-American speech patterns and used the phrase "hey Rican." (PSOF ¶ 35; Hubbard Aff. ¶ 63.)

Plaintiffs claim that on numerous occasions shop employees put garbage on their customary seat in the shop. (See PSOF ¶ 29; Hubbard Aff. ¶¶ 13, 22, 49-A; Ruiz-Mok Aff. ¶¶ 9, 10, 24, 28, 38, 63.) When Hubbard complained about this practice to Lesto in October 2003, he told her that she was not wanted in the shop and to get used to such treatment. (Hubbard Aff. ¶ 13.)

Plaintiffs also cite several specific examples of overt discrimination perpetrated by unnamed co-workers in the mechanical shop. First, on September 30, 2005, they found newspaper clippings containing the words "targeted DEFIANT COUPLE CRIES" and "Hose in charge," as well as a blurry drawing of a black woman, posted on the shop walls. (Hubbard Aff. ¶ 62.) On November 2, 2005, Plaintiffs noticed the same drawing of a black woman reattached to the door with the word "monster" pasted on it and the words "DIARY OF A MAD BLACK WOMAN" attached below, both in newsprint. (DSOF ¶ 34; Hubbard Aff. ¶ 67; Ruiz-Mok Aff. ¶ 106.) Another clipping read, "Are you ready for DISASTER?" (Pls.' Mem., Ex. D; Hubbard Aff. ¶ 67.) These clippings remained on the wall in the shop until November 14, 2005, when Plaintiffs were deposed. (Hubbard Aff. ¶ 67.)[10] On March 10, 2006, Plaintiffs found a picture of monkeys posted in the mechanical shop, with an accompanying headline stating, "U.S. courts nixes two sisters." (Pls.' Mem., Ex. D; PSOF ¶ 34; Hubbard Aff. ¶ 83.)

### C. Plaintiffs' Complaints and Allegations of Retaliation

In October 2003, Hubbard complained to Ten Berge about Lesto's work rotation policy and other perceived instances of discrimination. (Hubbard ¶ 13.) He allegedly instructed her to "grow

---

[10] According to Hubbard, on November 21, 2005, a Port Authority supervisor met with mechanical shop employees regarding the postings and warned them to stop. (Hubbard Aff. ¶ 70.)

thick skin." (Hubbard ¶ 13; Ruiz-Mok ¶ 12.)  Two days later, while giving out the day's

assignments, Lesto announced to the entire shop that Plaintiffs were being transferred and handed

them envelopes that, ultimately, did not contain transfer orders. (Hubbard ¶ 13; Ruiz-Mok ¶ 8.)

In December 2003 and January 2004, both Hubbard and Ruiz-Mok composed letters to their

superiors to complain about incidents involving Fred Lesto. (PSOF ¶ 28.)  Hubbard charged that on

December 10, 2003, she had an argument with Lesto about an assignment. (See Ten Berge Aff., Ex.

K.)  When she went to Ten Berge to complain about Lesto's conduct, Lesto interrupted their meeting

and said that Hubbard "had an attitude." (Ten Berge Aff., Ex. K; Hubbard Aff. ¶ 9.)  Hubbard claims

that Ten Berge told her to "grow tough skin." (PSOF ¶ 18.)  Hubbard informally documented the

incident in a letter to John Ten Berge dated December 14, 2003 (Ten Berge Aff. Ex. K.), but filed a

formal complaint in a January 11, 2004 letter to Margaret Zampanelli that was copied to Ten Berge,

Ruiz-Mok, Saporito, and union representative Robert Matheson (Ten Berge Aff., Ex. L).  This

second letter referred to an additional incident where Lesto insinuated that Hubbard refused to do her

job when, in fact, she lacked the training or assistance to perform the task. (Ten Berge Aff., Ex. L.)

At the conclusion of that letter, she wrote, "I am a willing hard working African American Woman

in a predominantly White male workplace environment.  As a result, of my race and gender, I feel

that I am being discriminated against." (Ten Berge Aff., Ex. L.)

In her formal complaint letter dated January 12, 2004, Ruiz-Mok also documented the

hostility of the work environment, specifically an instance when she felt singled out and humiliated

when reprimanded after requesting to leave an hour early. (Ten Berge Aff., Ex. M.)  Regarding

Lesto's treatment, she wrote, "it undermines my ability to perform my job . . . which is made even

more difficult by being an African American female working in a predominantly white male

environment." (Ten Berge Aff., Ex. M.)  Ruiz-Mok alleges that Lesto retaliated against Plaintiffs for

lodging these complaints by barring them from eating breakfast with the other shop employees. (Ruiz-Mok Aff. ¶ 19.)

In October 2004, both Hubbard and Ruiz-Mok filed formal complaint letters to Stephanie Desire-Lewis that were copied to Saporito, Kravits, Ten Berge, and their union representative Robert Matheson. (Hubbard Aff. ¶ 26.; Ruiz-Mok Aff. ¶ 37.) Copies of these letters were not provided to the court. In their letters, Plaintiffs complained that Lesto assigned them to menial jobs, individually, rather than with a mechanic, and used abusive behavior. (PSOF ¶ 30; Hubbard Aff. ¶ 26; Ruiz-Mok Aff. ¶ 37.) Ruiz-Mok met with Desire-Lewis to discuss the letter on November 9, 2004 and was told that she would never be equal to McVey or Smith. (Ruiz-Mok Aff. ¶ 39.) Hubbard claims that, when she met with Desire-Lewis on December 14, 2004, she insinuated that Hubbard's decision to remain in the shop's abusive environment was stubborn and masochistic. (PSOF ¶ 32; Hubbard Aff. ¶ 29.) Desire-Lewis claims that she was not aware that Plaintiffs were complaining about racial discrimination but investigated that possibility in any event. (DSOF ¶ 32.) Plaintiffs argue that Desire-Lewis should have known that they were making discriminatory charges given their prior correspondence. (PSOF ¶ 31.)

Ruiz-Mok contacted Desire-Lewis when, in early 2005, Kravitz informed her that her job performance was poor—as documented in reviews submitted by Lesto (Ten Berge Aff., Ex. N)—and threatened to transfer her out of the shop. (Ruiz-Mok Aff. ¶¶ 42, 44, 45.) Ruiz-Mok complained that she had not seen the poor performance reviews because they had not been placed in her personnel file[11] and that she was scared that she would be moved into an even more inhospitable shop. (PSOF ¶ 26) When Ruiz-Mok finally received the reviews, she gave a written response to Lesto, who became angry, denied her access to a vehicle, and assigned her menial tasks. (Ruiz-Mok Aff. ¶ 51.)

---

[11] Lesto also composed numerous performance reviews for Hubbard. (Ten Berge Aff., Ex. O.) Hubbard claims that she never saw these complaints. (PSOF ¶ 27.) The complaint suggests that Lesto "had just created" the performance reviews in retaliation against Plaintiffs' grievances. (Compl. ¶ 43.)

Plaintiffs encountered increased hostility after the present suit was filed.  Ruiz-Mok alleges that in May 2005 Lesto "verbally attacked" her and warned her to watch what she said. (Ruiz-Mok Aff. ¶ 72.)  The aforementioned newspaper clippings also appeared in Fall 2005 after Plaintiffs filed this action.

## DISCUSSION

### I.  Post-Complaint Allegations

In their reply brief, Defendants maintain, presumably pursuant to Rule 15(d) of the Federal Rules of Civil Procedure[12], that evidence of events alleged to have occurred after service of the Complaint on May 5, 2005 cannot be considered for the first time at the summary judgment stage, given Plaintiffs' failure to move for and file a court-authorized amended complaint. (D. Reply 2.) The Court rejects Defendants' argument.

Under Rule 15(b), a district court may consider claims outside those raised in the pleadings so long as doing so does not cause prejudice. See Fed. R. Civ. P. 15(b) ("When an issue not raised by the pleadings is tried by the parties' express or implied consent, it must be treated in all respects as if raised in the pleadings.").  The rule permits consideration of events not pled if "the claims arise out of the scheme that was the focus of the pleadings, the claims are directly related to the earlier violation, and there was no undue prejudice to the defendants." Jund v. Town of Hempstead, 941 F.2d 1271, 1287 (2d Cir. 1991); see also Cruz v. Coach Stores, Inc., 202 F.3d 560, 569-70 (2d Cir. 2000) (approving district court's consideration of unpled claims where defendants "failed to demonstrate any prejudice arising" from such consideration).

Here, upon service of the Complaint, Defendants were on notice that Plaintiffs were alleging a continuing action based on Defendants' allegedly discriminatory conduct and creation of a hostile

---

[12] Rule 15(d) permits "a party to serve a supplemental pleading setting out any transaction, occurrence, or event that happened after the date of the pleading to be supplemented."  Defendants did not specifically refer to Rule 15(d) in their papers.

work environment. The challenged affidavits speak directly to that course of conduct. Moreover, counsel for Defendants took depositions of Plaintiffs in November 2005 in which post-complaint events were discussed at length. Defendants are not prejudiced. They knew that Plaintiffs continued to work at the Port in the same positions, with the same co-worker defendants and had already raised post-complaint allegations at deposition. Therefore, Defendants' request to bar evidence of post-complaint events is denied. See Miltland Raleigh-Durham v. Myers, 807 F. Supp. 1025, 1052 (S.D.N.Y. 1992) (considering evidence of post-complaint events because they "arise out of the scheme that was the focus of the pleadings and are directly related to [defendants'] earlier wrongdoing").

## II. Legal Standard for Summary Judgment Under Rule 56

A motion for summary judgment shall be granted if there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c). The Court must resolve all ambiguities and draw all factual inferences in favor of the nonmoving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). The nonmoving party, however, may not rely solely on "[c]onclusory allegations, conjecture, and speculation." Niagara Mohawk Power Corp. v. Jones Chem., Inc., 315 F.3d 171, 175 (2d Cir. 2003) (internal citations and quotation marks omitted). Instead, she must present specific evidence in support of her contention that there is a genuine dispute as to the material facts. See, e.g., Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986); Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998); Rexnord Holdings, Inc. v. Bidermann, 21 F.3d 522, 525 (2d Cir. 1994).

In employment discrimination cases, where the employer's intent and state of mind are in dispute, the Court must proceed with caution. See Carlton v. Mystic Transp., Inc., 202 F.3d 129, 134 (2d Cir. 2000). Summary judgment should be limited to situations where there is a complete lack of

evidence in support of the plaintiff's position, or the evidence is so overwhelmingly slanted in favor of the defendant "that any contrary finding would constitute clear error." Danzer v. Norden Sys., Inc., 151 F.3d 50, 54 (2d Cir. 1998).  Still, a plaintiff "is not entitled to a trial simply because the determinative issue focuses on the defendant's state of mind." Dister v. Cont'l Group, Inc., 859 F.2d 1108, 1114 (2d Cir. 1988).  As this Circuit has cautioned:

> The summary judgment rule would be rendered sterile . . . if the mere incantation of intent or state of mind would operate as a talisman to defeat an otherwise valid motion.  Indeed, the salutary purposes of summary judgment—avoiding protracted, expensive and harassing trials—apply no less to discrimination cases than to commercial or other areas of litigation.

Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir. 1985).

## III.  Anti-Discrimination Law

Plaintiffs bring their claims under 42 U.S.C. § 1981.  Section 1981 "protects the equal right of '[a]ll persons within the jurisdiction of the United States' to 'make and enforce contracts' without respect to race." Domino's Pizza, Inc. v. McDonald, 546 U.S. 470, 474 (2006) (citing 42 U.S.C. § 1981(a)).[13]

The Court addresses Plaintiffs' two basic contentions under § 1981—hostile work environment and disparate treatment—in turn.

### A.  Hostile Work Environment

#### 1.  Applicable Law

To establish a prima facie case of hostile work environment, the plaintiff must demonstrate that:  (1) the workplace was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of his work environment, and (2) a specific basis exists for imputing the conduct that created the hostile work environment to the employer. Schwapp v. Town

---

[13] For the purposes of section 1981, "the term 'make and enforce contracts' includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b).

of Avon, 118 F.3d 106, 110 (2d Cir. 1997) (quoting Van Zant v. KLM Royal Dutch Airlines, 80 F.3d 708, 715 (2d Cir. 1996) (internal quotation marks omitted)).  "The plaintiff must show that the workplace was so severely permeated with discriminatory intimidation, ridicule, and insult that the terms and conditions of [his] employment were thereby altered." Alfano v. Costello, 294 F.3d 365, 373 (2d Cir. 2002).  The misconduct must be sufficiently severe and pervasive "to create an environment that 'would reasonably be perceived, and is perceived, as hostile or abusive.'" Schwapp, 118 F.3d at 110 (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 22 (1993)); see also Pearson v. Bd. of Educ., 499 F. Supp. 2d 575, 592 (S.D.N.Y. 2007) (noting that the standard has both an objective and subjective component).  "As a general rule, incidents must be more than 'episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive.' Isolated acts, unless very serious, do not meet the threshold of severity or pervasiveness." Alfano, 294 F.3d at 374 (internal citation omitted).  "Where reasonable jurors could disagree as to whether alleged incidents of racial insensitivity or harassment would have adversely altered the working conditions of a reasonable employee, the issue of whether a hostile work environment existed may not properly be decided as a matter of law." Patterson v. County of Oneida, 375 F.3d 206, 227 (2d Cir. 2004).  The inquiry is fact specific and must be determined on a case-by-case basis. Schwapp, 118 F.3d at 110.

### 2. Application

Viewing the record in the light most favorable to Plaintiffs, a reasonable fact-finder could conclude that Plaintiffs were subjected to a hostile work environment.  The alleged misconduct occurred on a regular basis over the course of at least two years and there is sufficient evidence that such misconduct was motivated by racial animus.  Plaintiffs have established genuine issues of fact regarding their subjective perception of the work environment.  In both the present opposition and in

complaint letters contemporaneous with the alleged abuse, Plaintiffs express their humiliation, fear, and frustration stemming from their treatment in the mechanical shop.

The record also contains evidence by which a reasonable fact-finder might conclude that the work environment at Port Newark was pervasively hostile and abusive. Plaintiffs report threats, insults, condescension, and ridicule. While not every allegation bespeaks evidence of overt racial animus, these "[f]acially neutral incidents may be included . . . among the 'totality of the circumstances' that courts consider in any hostile work environment claim, so long as a reasonable fact-finder could conclude that they were, in fact, based on [race]." <u>Alfano</u>, 294 F.3d at 377-78. Here, the use of blatant racial stereotypes, as suggested by the pictures and newspaper clippings attached to the shop walls, provides a basis for inferring that "incidents [race]-neutral on their face were in fact discriminatory." <u>Id.</u> At the very least, at this stage of the case, it cannot be said that Plaintiffs will be unable to establish that they worked in a sufficiently pervasive discriminatory environment.

Accordingly, Defendants' motion is denied with respect to Plaintiffs' hostile work environment claim.

**B. Disparate Treatment**

**1. Standards**

On summary judgment, disparate treatment claims are analyzed under the three-part burden-shifting test set forth in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973). First, the plaintiff must make out a prima facie case of discrimination by race, "by either direct, statistical or circumstantial evidence." <u>Bickerstaff v. Vassar College</u>, 196 F.3d 435, 445 (2d Cir. 1999); <u>McDonnell Douglas</u>, 411 U.S. at 802, by showing: (1) membership in a protected race; (2) qualification for the employment position; (3) that the plaintiff suffered an adverse employment

action; and (4) that the adverse employment action occurred under circumstances giving rise to an inference of discrimination. <u>Dawson v. Bumble & Bumble</u>, 398 F.3d 211, 216 (2d Cir. 2005); <u>Rosen v. Thornburgh</u>, 928 F.2d 528, 532 (2d Cir. 1991) (citing <u>McDonnell Douglas</u>, 411 U.S. at 802).

   If the plaintiff makes the <u>de minimis</u> showing required to state a prima facie case, <u>Patterson v. County of Oneida</u>, 375 F.3d 206, 221 (2d Cir. 2004), the burden of production shifts to the defendant to provide a legitimate, nondiscriminatory reason, supported by admissible evidence, for its actions. <u>St. Mary's Honor Center v. Hicks</u>, 509 U.S. 502, 506 (1993); <u>McDonnell Douglas</u>, 411 U.S. at 802; <u>Dawson</u>, 398 F.3d at 216. If an employer articulates a nondiscriminatory justification for its conduct, the inference of discrimination raised by plaintiff's prima facie case "simply drops out of the picture," <u>St. Mary's Honor Ctr.</u>, 509 U.S. at 511, and the burden shifts back to the plaintiff to prove by competent evidence that the employer's nondiscriminatory explanation is pretextual, <u>id.</u> at 507-08.

### 2. Plaintiffs' Prima facie Case

   The first two elements of Plaintiffs' prima facie disparate treatment claim are not in dispute: Plaintiffs are within a protected class on the basis of their race, and, for the purposes of this motion, Defendants do not contest Plaintiffs' qualifications for the general maintainer title. Plaintiffs have also satisfied their minimal burden on the fourth element by raising an inference that the employment decisions complained of were motivated by race because they were treated differently than similarly situated white employees. It is a much closer question, however, as to whether Plaintiffs make even the <u>de minimis</u> showing required to establish that they suffered an adverse employment action. (<u>See</u> Defs' Memo at 14-19; Defs' Reply Memo at 10-11.) They were always given work within their job classification, and there is no evidence of pay discrimination or the denial of promotional opportunities.

"A plaintiff sustains an adverse employment action," and thereby satisfies the third element of the prima facie case, "if he or she endures a 'materially adverse change' in the terms and conditions of employment." Galabya v. New York City Bd. of Educ., 202 F.3d 636, 640 (2d Cir. 2000). Material adversity is "more disruptive than a mere inconvenience or an alteration of job responsibilities," Sanders v. New York City Human Res. Admin., 361 F.3d 749, 755 (2d Cir. 2004) (quotation omitted), and might be indicated by a "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation," Schiano v. Quality Payroll Sys., Inc., 445 F.3d 597, 609 (2d Cir. 2006) (internal quotations and citations omitted). There are no bright line rules in applying this standard. Pearson, 499 F. Supp. 2d at 595. "Whether a particular [action] is materially adverse depends upon the circumstances of the particular case, and should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances." Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 126 S. Ct. 2405, 2417 (2006) (quotations omitted).

Plaintiffs assert that the following are the principal examples of the adverse employment actions taken against them by Defendants: (1) the denial of training; (2) the assignment of a disproportionately onerous and discriminatory workload; (3) the denial of overtime and other privileges of employment. Though mindful that Plaintiffs' burden in this regard is minimal, the Court concludes that Plaintiffs have failed to establish a prima facie case of disparate treatment because the actions about which they complain are not materially adverse.

### a. Denial of Training

Plaintiffs claim that they were deprived of on-the-job training that Defendants provided for similarly-situated white employees, because they were not assigned to work with mechanics.

Specifically, they allege that general maintainers "learn more and advance on the job when they are assigned to work with the mechanics." (Compl. ¶ 18.) Defendants argue that Plaintiffs have failed to allege that they suffered an adverse employment action, because "they have not shown that they were entitled to training as part of their job." (Defs.' Reply at 10-11.)

A plaintiff alleging unequal access to training must demonstrate that the employer offered training to other employees and that the plaintiff was denied that training under circumstances giving rise to an inference of discrimination. See Lopez v. Metro. Life Ins. Co., 930 F.2d 157, 161 (2d Cir. 1991); Silva v. Peninsula Hotel, 509 F. Supp. 2d 364, 379 (S.D.N.Y. 2007). Thus, as an initial matter, Plaintiffs must show that Port Authority had a policy of providing on-the-job training to its general maintainers.

Plaintiffs make no such showing. Defendants state that merely working with a mechanic— either a plumber or steam and sprinkler fitter—does not constitute training for a mechanic title. (Defs.' Mem. at 16.) Job descriptions for the plumber and steam and sprinkler fitter positions make no mention of training responsibilities associated with these positions. (See Ten Berge Aff., Exs. F & G.) Instead, formalized job training for the mechanic positions is offered by Plaintiffs' union, Local 68, and, from time to time, by the Port Authority Human Resources Department. (See Ten Berge Aff. ¶¶ 31-32.) Moreover, per the official job specification, general maintainers are not entitled to training by mechanics. (See Ten Berge Aff., Ex. A.)[14]

In support of their claim, Plaintiffs allege only that former co-worker Gail Scala became a mechanic after "gaining experience" by working with mechanics as a general maintainer. (see Ruiz-

---

[14] There is at least some recognition by Port Authority that the general maintainer position is a stepping stone to higher-titled work. The notification bulletin announcing the training program for the general maintainer position states that, "[u]pon successful completion of the program, participants . . . will be eligible to participate in promotional exams for all Trades Helper positions, except Trades Helper Electrical." (Ten Berge Aff., Ex. B.) Fred Lesto also conceded that, in order to pass the qualifying test for a mechanic position, an applicant would have to acquire some working knowledge by assisting mechanics. (Lesto Dep. 37-38.) The job specification and related notification do not suggest any entitlement to an on-the-job training program, much less an apprenticeship.

Mok Aff. ¶ 35)  A single, cursory example of an employee "gaining experience" is insufficient to

meet even Plaintiffs' de minimis burden, especially when that example fails to evidence a policy of

on-the-job training.  Plaintiffs, therefore, fail to provide competent evidence from which a jury could

reasonably find that the denial of on-the-job training constituted an adverse employment action.[15]

### b. Discriminatory Work Assignments

Plaintiffs' also allege that their supervisors allocated them, on a discriminatory basis, an

inordinate share of undesirable tasks.  The Second Circuit has confirmed that an employee's receipt

of a "disproportionately heavy workload" may constitute a materially adverse employment action.

Feingold v. New York, 366 F.3d 138, 152-53 (2d Cir.2004).  In Feingold, a white administrative law

judge ("ALJ") satisfied the third element of his prima facie case by offering testimonial evidence

that, in the absence of the white Chief ALJ, the acting Chief ALJ, an African-American, shifted

cases from African-American ALJs to white ALJs. Id. at 153.  In addition, the African-American

Chief Clerk adjusted the ALJs' workload to give white ALJs more work than their African-

American counterparts. Id.

In this case, Plaintiffs have offered testimonial evidence that they have been given a

disproportionate amount of menial work as compared to the white general maintainers.  However,

this Court finds that Plaintiffs' allegations of excessive or unfair work assignments, without more, do

not amount to "'adverse employment actions' because they are not materially adverse changes in the

terms or conditions of their employment. See Delgado v. Triborough Bridge & Tunnel Auth., 485 F.

Supp. 2d 453, 461 (S.D.N.Y. 2007); Fridia v. Henderson, No. 99 Civ. 10749 (BSJ), 2000 WL

1772779, at *7 (S.D.N.Y. Nov. 30, 2000).  Unlike the plaintiff in Feingold, Plaintiffs here have

---

[15] Plaintiffs also fail to make the requisite showing that their lack of training impacted either their opportunities for professional growth and career advancement or directly on their compensation. See Nakis v. Potter, No. 01 Civ. 10047, 2004 WL 2903718, at *20 (S.D.N.Y. Dec. 15, 2004).  There is no evidence that Hubbard or Ruiz-Mok were passed over for promotion to a mechanic grade title or that they even enrolled in a training course for such a position.

failed to demonstrate "negative ramifications for the plaintiff's job conditions," <u>Fairbrother v. Morrison</u>, 412 F.3d 39, 56 (2d Cir.2005) (citation and internal quotation omitted), <u>abrogated on other grounds by</u>, <u>Burlington N.</u>, 126 S. Ct. at 2405, or, in fact, any change to their employment status. There is simply no evidence that Plaintiffs received a more equitable share of assignments at the start of their tenure in the mechanical shop than at some later time. That negative change which signifies adversity is absent.

In addition, Plaintiffs' claim that they were given dirty, burdensome, and/or menial assignments in isolated places, such as water carts, cleaning pits, and blowing down the low points, does not constitute a "materially adverse change" in their employment duties, because these duties are precisely what the general maintainer job description calls for. (<u>See</u> Ten Berge Aff., Ex. A.). They cannot complain of work properly assigned to them. <u>See</u> <u>Wood v. Sophie Davis Sch.</u>, No. 02 Civ. 7781 (HB), 2003 WL 22966288, at *6 (S.D.N.Y. Dec. 15, 2003) (finding no adverse employment action where "the clerical work . . . assigned to plaintiff, fell squarely within her job function"). Indeed, Plaintiff Hubbard admitted that she was aware that the responsibility for such tasks fell within the job description at the time she enrolled in the training class for the general maintainer position. (Hubbard Dep. 17-18.)

Plaintiffs' other assignment-related complaints, which they characterize as "obstacles" that Lesto created specifically for Plaintiffs, also fail to qualify as adverse employment actions. (Compl. ¶ 34.) Plaintiffs' uncorroborated allegations that Lesto and various mechanics subjected them to excessive scrutiny and review are unsupported by evidence that the other general maintainers were treated any differently. "[C]ourts in this circuit have found that reprimands, threats of disciplinary action and excessive scrutiny do not constitute adverse employment actions in the absence of other negative results such as a decrease in pay or being placed on probation." <u>Uddin v. City of New York</u>,

427 F. Supp. 2d 414, 419 (S.D.N.Y. 2006) (internal quotations and citations omitted); see also Hill v. Rayboy-Brauestein, 467 F. Supp. 2d 336, 354-55 (S.D.N.Y. 2006) (finding "alleged micro-management," without more, was not an adverse employment action); Castro v. N.Y. City Bd. of Educ. Pers., No. 96 Civ. 6314, 1998 WL 108004, at *7 (S.D.N.Y. Mar. 12, 1998) ("[A]lthough reprimands and close monitoring may cause an employee embarrassment or anxiety, such intangible consequences are not materially adverse alterations of employment conditions."). Plaintiffs' other contentions—that Lesto assigned them to do two-person jobs individually, that Plaintiffs worked in confined spaces without proper training, that Plaintiffs were denied access to a vehicle, that Plaintiffs were forced to work through the breakfast break—also fail to rise to the level of an actionable adverse employment action.

Accordingly, Plaintiffs have failed to state a prima facie claim for disparate treatment stemming from Defendants' allegedly unfair assignment practices.

### c. Denial of Overtime

Plaintiffs next contend that they suffered an adverse employment action by being denied overtime and the opportunity to work through lunch and either count that time as overtime or leave early for the day. On the record as it stands, however, Plaintiffs have failed to show that they were actually denied meaningful opportunities for overtime, at least relative to similarly situated white general maintainers. After a full opportunity for discovery, Plaintiffs submit no evidence of how much overtime work they were afforded while at Port Newark nor how much overtime they rejected. Neither is there evidence of how much overtime McVey and Smith received nor when that overtime was scheduled. Although Plaintiffs generally allege that Lesto and their other superiors distributed choice overtime to non-minority co-workers, without "affirmative and specific" supporting evidence that Plaintiffs were actually denied overtime, this claim cannot survive summary judgment. See

Wilson v. N.Y. City Dep't of Transp., No. 01 Civ. 7398 (RJH), 2005 WL 2385866, at *18 (S.D.N.Y. Sept. 28, 2005); Taylor v. Potter, No. 99 Civ. 4941 (AJP), 2004 WL 1811423, at *23 (S.D.N.Y. Aug. 16, 2004) (rejecting denial of overtime claim where there was "no evidence that [plaintiff] was offered fewer opportunities to work overtime . . . or was offered fewer opportunities than other similarly situated employees.").

### 3. Defendants' Non-Discriminatory Justification

While the Court finds that Plaintiffs failed to establish a prima facie case, out of an excess of caution, the Court will assume that Plaintiffs have met their minimal burden and address the remaining stages of the McDonnell-Douglas framework. Here, Defendants contend that (1) Plaintiffs did not and cannot show through credible evidence that they, in fact, received treatment different from that of the other general maintainers, and (2) if any discrepancy does exist, it is attributable to a non-discriminatory justification—namely, that work was assigned based on a system of seniority preserved by the union contract. The Court assesses the strength of Defendants' evidence on these points.

With respect to all claims, Defendants rely on statistical evidence to support their contention that Plaintiffs were not treated differently than the non-minority general maintainers, citing work records from 2004 and 2005. (See Defs.' Mem. at 16-17, 18-19.) First, to rebut Plaintiffs' claim that they were denied on-the-job training with mechanics, Defendants submit daily work schedules maintained in the Port Authority's Maintenance Management Information System ("MMIS"), which demonstrate that Plaintiffs "had a significant number of work assignments with Mechanics." (Ten Berge Aff. ¶ 33.) From October 1, 2003, when Plaintiffs joined the mechanical shop, to April 28, 2005, when they commenced this action, Hubbard worked by herself 31% of the time and with a

mechanic 53% of the time.[16] (Ten Berge Aff. ¶ 34 & Ex. I.)  Ruiz-Mok worked alone 26.1% of the

time and with a mechanic 52% of the time.[17] (Ten Berge Aff. ¶ 35 & Ex. I.)  During the same period,

Smith worked with a mechanic 36.5% of the time and McVey worked with a mechanic 49.3% of the

time. (Ten Berge Aff. ¶ 36 & Ex. I.)

Defendants next demonstrate that, contrary to Plaintiffs' allegations, all four general

maintainers performed the same basic tasks.  Using the task "blowing down the low points" as a

proxy, Defendants cite employment records from 2004 and 2005 which indicate that Smith and

McVey were assigned to this task on a number of occasions. (Ten Berge Aff. ¶¶ 17-20 & Ex. C.)

The work schedules also show that McVey cleaned the shop, put away inventory, and cleared snow

on multiple occasions throughout 2004 and 2005. (Ten Berge Aff. ¶¶ 21-22 & Ex. C.)

Defendants' Daily Attendance/Overtime Authorization records rebut Plaintiffs' claims that

they were not allowed to work through lunch and either leave early or take overtime. (See Compl. ¶

27.)  According to the Ten Berge Affidavit, Hubbard worked through lunch 21 times and Ruiz-Mok

worked through lunch 23 times from December 2003 to April 2005. (Ten Berge Aff. ¶¶ 26-27 & Ex.

E.)  In addition, Defendants cite records that demonstrate that Hubbard and Ruiz-Mok turned down

many opportunities for overtime from 2003 to 2005. (Ten Berge Aff. ¶¶ 37-41 & Ex. J.)  For

instance, in 2004, Hubbard worked 67 hours of overtime and refused the opportunity to work 129

hours of overtime, and Ruiz-Mok worked 98.4 hours and refused 131.5 hours. (Ten Berge Aff. ¶ 39

& Ex. J.)

Defendants also provide a legitimate, non-pretextual justification for any purported

discriminatory impact.  They state that any discrepancy in work assignments can be explained by

---

[16] Hubbard was assigned to work with a plumber 30.7% of the time, and with a steam and sprinkler fitter 22.3% of the
time. (Ten Berge Aff. ¶ 34 & Ex. I.)
[17] Ruiz-Mok was assigned to work with a plumber 33.2% of the time, and with a steam and sprinkler fitter 18.8% of the
time. (Ten Berge Aff. ¶ 34 & Ex. I.)

Port Authority's reliance on a seniority system for work allocation. (Defs.' Mem. at 15.) The union contract that governs the general maintainers' employment contains a past practices provision. (Ten Berge Aff., Ex. D.) According to Defendants, one of these practices is the recognition of seniority—in grade, at the facility, and in the shop—in the assignment process, whereby "[t]he more senior GMs get the preferred assignments. (Ten Berge Aff. ¶ 11.) Defendant Ten Berge states that Smith has been a general maintainer since March 2, 1995 (seniority in grade) and had been assigned to NJMT since September 28, 1998 (seniority at the facility). (Ten Berge Aff. ¶ 12.) McVey became a general maintainer on December 4, 2000 (seniority in grade) and had been assigned to the mechanical shop since October 13, 2000 (seniority in the shop). (Ten Berge Aff. ¶ 12.) Compared to Plaintiffs, Smith was senior in grade and at the Port Newark facility, and McVey was senior in grade and in the mechanical shop.[18] Reliance on a well-established seniority policy does qualify as a legitimate non-discriminatory reason for a challenged employment decision. See Brown v. Principi, No. 04 Civ. 1232 (PAC), 2007 WL 959375, at *5 (S.D.N.Y. Mar. 29, 2007); McFadden v. Mem'l Sloan-Kettering Cancer Ctr., No. 04 Civ. 9629 (SAS), 2006 WL 2930200, at *5 (S.D.N.Y. Oct. 11, 2006).

### 4. Evidence of Pretext

Since Defendants have articulated legitimate, non-discriminatory reasons for their actions, Plaintiffs have the full and fair opportunity to demonstrate that the proffered reasons were in fact pretexts for discrimination. St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 507-08 (1993) (citation omitted). "[T]he plaintiff, in order to defeat summary judgment, must present evidence sufficient to allow a rational factfinder to infer that the employer was actually motivated in whole or in part by ... discrimination." Grady v. Affiliated Cent., Inc., 130 F.3d 553, 560 (2d Cir. 1997). The Court

---

[18] In his deposition, Fred Lesto testified that "[s]eniority rules" (Lesto Dep. 39) and that "[w]ater carts and ship pits go to the lowest person in seniority" (Lesto Dep. 41.).

reviews the record mindful that for the purposes of the instant motion, it is only to determine whether a genuine issue of material fact exists after viewing the evidence in a light most favorable to Plaintiffs and after giving them the benefit of all reasonable inferences.

To counter the considerable statistical evidence showing that Plaintiffs' workloads were comparable and neither excessive nor overly burdensome, Plaintiffs offer only an unsubstantiated argument that they observed McVey on a number of occasions not performing work that he had been assigned. The implication is that the figures submitted by Defendants track only assignments and not actual performance, but they provide no hard evidence to support their contention. As to overtime, Plaintiffs claim that their opportunities were restricted to weekend hours rather than during the work week. Here, Plaintiffs fail to even offer an explanation as to why these hours were somehow less desirable or, more importantly, how these offerings bear indicia of racial animus. This is weak evidence of discrimination and insufficient to demonstrate that there remain genuine issues of material fact as to these issues.

Plaintiffs pretext argument is also predicated on Lesto's deposition testimony regarding Gail Scala, a former general maintainer in the mechanical shop. Lesto acknowledged that Scala and McVey were assigned to "do water carts and pit work" but "didn't know who between the two of them had more seniority." (Pls.' Mem. at 6-7; see Lesto Dep. 42-45.) Taken in isolation, his testimony tends to suggest that, before Plaintiffs' arrived in the shop, work was assigned without regard to one's seniority status. However, Lesto's faulty recollection, without more, fails to suggest that the allocation of work by seniority was pretext for a policy of discrimination.

In addition, Plaintiffs have failed to provide any evidence that any disparate treatment they received was motivated by racial animus. See Bickerstaff, 196 F.3d at 447 (noting that plaintiff attempting to establish pretext "may not prevail by establishing only [falsity], but must prove, in

addition, that a motivating reason was discrimination.") (internal quotation marks and citations omitted). In the absence of any such evidence, the record as a whole is not "sufficient to sustain an 'ultimate finding' of intentional discrimination." Peterson v. City Coll., 32 F. Supp. 2d 675, 684 (S.D.N.Y.1999) (citation omitted). Accordingly, Plaintiffs' claims for disparate treatment in the circumstances of their employment are dismissed.

## IV. Individual Defendants

Defendants move to dismiss the § 1981 claims against the Individual Defendants. As Plaintiffs have failed to state a claim of disparate treatment against any defendants, the Court considers Plaintiffs allegations of individual liability only insofar as the hostile work environment claim is implicated. The incidents recited in support of the disparate treatment claim are relevant, however, to the extent they are part of the overall mix of evidence bearing on the hostile work environment claim. See Alfano, 294 F.3d at 375-76.

"In order to make out a claim for individual liability under § 1981, 'a plaintiff must demonstrate some affirmative link to causally connect the actor with the discriminatory action. . . . [P]ersonal liability under section 1981 must be predicated on the actor's personal involvement.'" Patterson v. County of Oneida, 375 F.3d 206, 229 (2d Cir. 2004) (quoting Whidbee v. Garzarelli Food Specialties, Inc., 223 F.3d 62, 75 (2d Cir. 2000)). "Personal involvement, within the meaning of this concept, includes not only direct participation in the alleged violation but also gross negligence in the supervision of subordinates who committed the wrongful acts and failure to take action upon receiving information that constitutional violations are occurring." Id.

Plaintiffs do not allege that Desire-Lewis had any direct role in creating a hostile work environment or that she was a manager supervising their co-workers. Rather, their claim is predicated solely on her allegedly insufficient response to Plaintiffs' letters of complaint in October

2004.[19]  A fair reading of the letters indicates that Plaintiffs were complaining about the pattern of unfair work rotation but not in the context of race discrimination.  In fact, in the limited excerpt of the Hubbard letter, provided by Plaintiffs in their opposition brief—the full letters were not submitted to the Court—Hubbard appears to make a gender-based allegation:  she complains about her "male co workers."[20]  (Pls.' Br. at 8.)  Thus, the claims raised in these letters, to the extent they make out a claim of gender-based discrimination, are different from those raised in this § 1981 action.[21]  Moreover, Plaintiffs make no allegation that Desire-Lewis failed to investigate their claims in the context of any form of discrimination.  Therefore, Plaintiffs have failed to raise any issues of material fact regarding Desire-Lewis and their claim against her is dismissed.

Plaintiffs' complaints regarding Saporito, Kravitz, and Ten Berge are similarly based on their failure to respond to the same types of grievances regarding their treatment by Lesto and the employees in the mechanical shop.  With no evidence of direct participation in the creation of an alleged hostile work environment nor any evidence that Plaintiffs even alerted them to race-based discrimination, Plaintiffs cannot maintain a cause of action against these individual defendants for their failure to address the allegations.

As to Lesto, however, who supervised Plaintiffs and their co-workers in the mechanical shop and allocated work assignments, Plaintiffs' claims survive.  While Plaintiffs claim that Lesto was cruel and harassing, they do not allege that he was openly racially discriminatory.  Rather, the survival of this claim is predicated on Lesto's supervisory role and the fact that many of the alleged incidents were perpetrated by those under his direct command.  In addition, to the extent that any

---

[19] Desire-Lewis testified that Plaintiffs' "allegations had to do with distribution of work, assignment of vehicles, being treated rudely by their supervisor." (Desire-Lewis Dep. 7.)

[20] Desire-Lewis testified that she did not understand Plaintiffs to raise a question of either race or gender; rather, they complained that they were treated rudely. (Desire-Lewis Dep. 38-41.)

[21] Plaintiffs argue that their claims were mirrored by conversations Desire-Lewis had with a mechanic, Jack Hughes, during the course of her investigation into Plaintiffs' complaints. (Pls.' Mem. at 9-10.)  Even if this is the case—and Desire-Lewis concedes that Hughes backed what the Plaintiffs' said in their letters (Desire-Lewis Dep. 15-17)—there is no indication that Hughes ever referenced race-based discrimination in his conversation with Desire-Lewis.

allegations of discrimination with regard to work assignments or the enjoyment of employment privileges are relevant to Plaintiffs' hostile work environment claim, possible claims survive against Lesto as the chief decision-maker. Thus, as to Lesto, Plaintiffs have raised genuine issues of material fact regarding his role, either directly or in a supervisory capacity, in creating the alleged hostile work environment.

## CONCLUSION

For the reasons stated above, Defendants' motion for summary judgment is GRANTED with respect to Plaintiffs' disparate treatment claim and DENIED with respect to Plaintiffs' hostile work environment claim. In addition, Defendants Desire-Lewis, Saporito, Ten Berge, and Kravitz are dismissed from this action.

The parties should meet and confer regarding pretrial matters and should contact the Court no later than Friday, February 29, 2008 to schedule a pretrial conference. The Clerk of Court is directed to terminate this motion.

Dated: February 19, 2008
New York, NY

SO ORDERED

PAUL A. CROTTY
United States District Judge